JONES et al. v. KEITH LUMBER CO. et al.
(No. 210.)

(Court of Civil Appeals of Texas. Beaumont. May 21, 1917. Rehearing Denied June 6, 1917.)

ADVERSE POSSESSION &115(5) — QUESTION FOR JURY.

A witness' testimony that he had lived on land claimed by adverse possession for 12 years under an arrangement with claimant's predecessor in title to evict squatters, etc., the arrangement being first verbal and evidenced by a written lease for the last six years, *held* not to establish title by adverse possession as a matter of law.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 314, 696, 697, 699, 700.]

Appeal from District Court, Hardin County; L. B. Hightower, Sr., Judge.

Trespass to try title by L. L. Jones and others against the Keith Lumber Company and others. Judgment for defendants, and plaintiffs appeal. Reversed and remanded.

W. D. Gordon, Thos. J. Baten, and H. M. Whitaker, all of Beaumont, for appellants. Parker & Kennerly, of Houston, and Sonfield, King & Sonfield, G. D. Anderson, and R. E. Masterson, all of Beaumont, for appellees.

BROOKE, J. This is a suit in trespass to try title, brought by the appellants, as plaintiffs below, against the Keith Lumber Company, Maryland Trust Company, Houston Oil Company of Texas, and Kirby Lumber Company, as defendants, for the recovery of an interest in the Elisha Duncan league of land in Hardin county. Excepting the west 1,000 acres, which was claimed by the Houston Oil Company, and its codefendants, the land claimed by the Keith Lumber Company had been sold to it by the Creighton-McShane Oil Company, a foreign corporation, and John A. McShane and others, under deeds of general warranty, and the record shows that the Keith Lumber Company, in the event of a recovery by the plaintiffs below, was entitled to recover for the quantity of land which it might lose in the litigation, upon its warranty. It accordingly brought in its warrantors, and these warrantors, through counsel, undertook the defense of the litigation. The Houston Oil Company, through its counsel, presented its defenses as to the claim asserted by it and its coclaimants to the west 1,000 acres of the league. The usual pleas of the statutes of limitation following the general issues and plea of not guilty were made by the defendants below. By supplemental petition, the plaintiffs pleaded the forgery of certain deeds, under which the defendant deraigned title to the land, outside of the common source of title under which all parties, plaintiffs and defendants, claimed the survey of land. Eliza McClusky et al., interveners in the suit, claimed the 160 acres of land by limitation. On the trial of the case, by agreement of all parties, judgment was rendered in favor of the interveners, McClusky et al., for 80 acres of land, and no one is now complaining of the judgment to that effect. The trial court instructed the jury to find for the defendants, against the plaintiffs, which being done, judgment was rendered accordingly that plaintiffs take nothing and that defendants recover of plaintiffs on their cross-actions. Plaintiffs, in fact, only asserted title to an undivided interest of 1,153 acres in the league. Motion for a new trial was duly made by plaintiffs, which being overruled, exception was duly taken, and this appeal is prosecuted from the aforesaid judgment.

We will not undertake to discuss the various assignments of error, inasmuch as the judgment must, in our opinion, be set aside, and a new trial granted, upon the question raised in appellants' sixth assignment of error. The said sixth assignment of error is as follows:

"The court erred in holding as matter of law that the possession of Ben Clark constituted a title by limitation to all of the land in controversy, except the west 1,000 acres, in the defendants, as will more fully appear from bill of exceptions taken to such holding."

There are two propositions presented under this assignment. The first is:

"Ben Clark, through whom adverse posession of 3,428 acres of the land in suit is claimed on behalf of the Creighton-McShane Oil Company, did not become the tenant of the said appellee until they entered into a contract of tenancy with him on, to wit, 28th day of May, 1910, less than five years before the institution of this suit. Prior thereto, there was no contract or agreement between the said parties which would create the relation of landlord and tenant, nor any privity whatsoever between them."

Without entering into a detailed discussion of this proposition, we will discuss the second proposition, which is as follows:

"The burden of proving adverse possession rests upon the party alleging it, and such possession so as to give a limitation title cannot be made out by inference only, but by clear and positive proof."

Under this, which is a sound legal proposition, it is the opinion of this court that the appellants were entitled to go to the jury, and that the court erred in holding that limitation obtained in this case as a matter of law. The testimony with reference to this limitation is as follows:

Ben Clark testified:

"I have lived on the Elisha Duncan league of land in Hardin county, and I now live on that league of land. I first became acquainted with the Elisha Duncan league of land in Hardin county in 1904. * * * It was in October of 1904. The way I first came to the Elisha Duncan league of land was I came there in a house boat. When I came there, I first tied my house boat onto the bank there. It was tied to the Elisha Duncan league. I moved that house and put it on the land. When I did that, it was the following year 1905. I will now tell you by what arrangements I moved my house boat onto the Duncan league. I had a conversation with Mr. Lobe Carlton. I asked him to try to get that place for me, as I wanted to live on it, and he told me that it would be all right for me to put my boat on the land. Mr. Lobe Carlton was to see the Creighton-McShane people with reference to my going on the land. He told me he had made arrangements for me to go upon the land. * * * I went on the land for the benefit of the Creighton-McShane Company. You ask me what really was the terms of my tenancy on that land, and I say it was with Mr. Carlton. I was supposed to look after the timber and see that nobody got on the land, was my understanding. * * * I had no conversation with anybody but Mr. Carlton about it. * * * What was I to do on that land for the Creighton-McShane people, was, I was supposed to look after the timber was my understanding, and keep anybody from squatting on the land; that was my understanding. I did do that. The improvements that I put upon the place, upon the Elisha Duncan league, was, I put up my house there and put up my garden. * * * I started the garden in 1904 in the fall, shortly after I landed there with the boat. My garden was fenced up, a fence around it. I built a house there. The way I built it was, I built a house, dining room, and kitchen, an addition to the house boat. As near as I can remember, when I did that was, I think, about 1906. I used the other portion of the land. You ask me when and how much, and I say, why, two years ago, I think, I had a hog pasture there, made an addition to the garden, put up another little garden. I judge my hog pasture to be between three and four acres, something like that. I have not been living anywhere besides the Duncan league during that time since I first lived there. Since the year 1904 I have lived where I am right now. * * * You ask me how long I have ever been absent from the place at one time, and I say that was last fall when I was sick. I think they kept me downtown 16 days, I mean by 'downtown' at Beaumont for 16 days. That is the longest period of absence since I first moved there. You ask me when I moved the house boat onto the Duncan league, how did I put the house on the land, and I say that I taken it out of the water and right upon the land, I put a foundation under it. I think the foundation is about four feet high. It is a wooden foundation. * * * Subsequently after going on the land I entered into a lease contract with the Creighton-McShane people. You have handed me an instrument to examine, and I see that my signature is signed to it. That is my signature there. This is the lease contract I executed on the 20th day of May, 1910. It is between the Creighton-McShane Company and the Miller-Vidor Lumber Company and Ben Clark. When I first went on the land, there was something said with reference to a lease. * * * Mr. Carlton told me that he would get a lease for me."

The lease introduced in evidence was as follows:

"This agreement and lease contract, made and entered into on this the 28th day of May, 1910, by and between Creighton-McShane Oil Co. of Douglas county, Nebraska, and the Miller Vidor Lumber Company, a corporation organized under the laws of the state of Texas, parties of the first part, and Ben Clark, of Hardin county, Texas, party of the second part, witnesseth: That in consideration of the sum of ten ($10.00) dollars and other considerations to them in hand paid by party of the second part, and in the further consideration hereinafter mentioned, the parties of the first part have this day let and leased, and by these presents do let and lease unto party of the second part the following described lands and premises, to wit: (Here description by metes and bounds of Elisha Duncan survey is omitted.)

"The party of the second part agrees to remain in actual possession of said land and premises under this lease until notified by parties of the first part to surrender said possession to them, their heirs or assigns, and to use his best efforts and energy to protect said land, and especially the growing timber thereon from trespass and from all manner of injury and depredation of any kind and character, and to report any and all acts of trespass at once upon the discovery thereof to parties of the first part. And he binds himself to refrain from cutting or removing any of the timber standing and growing upon said land and to hold said land and premises for the use and benefit of parties of the first part, according to their respective interests therein. Said Miller & Vidor Lumber Co. having a certain interest in the cypress and gum timber on said land.

"Party of the second part agrees to remain in continuous possession of all the land above described until notified to surrender possession. It is hereby agreed that any improvements heretofore erected or that may hereafter be erected upon the said land by the party of the second part shall remain the property of the second part, and he shall have the right to remove the same upon the termination of this lease. And it is further agreed and understood that the possession of the said described land, which has heretofore been had by party of the second part has been as the tenant and by permission of parties of the first part.

"Witness our hands in duplicate originals, on this the 28th day of May, 1910. Creighton-McShane Oil Co., by John A. McShane, Prest. Miller & Vidor Lumber Co., by E. H. Green, Jr., Parties of the First Part. Ben Clark, Party of the Second Part."

This deed was duly acknowledged by all parties thereto, and filed for record in the

office of the county clerk of Hardin county on September 8, 1910, recorded September 12, 1910, in Volume 55, p. 135, Deed Records of Hardin County.

Ben Clark further testified:

"Mr. Lobe Carlton had that contract prepared for me. I heard the lease contract read by you to the jury. You ask me what were the terms upon which I originally went upon the land, and I say the terms were for me to look after the land for them and try to keep anybody from squatting on there and to notify them. * * * I built that house boat at Port Arthur in 1903, and I got a tug to bring me up the river. * * * I left Port Arthur, it was supposed to be the equinox storm, that was supposed to come there the 21st of September, and I had a tug to tow me up so as not to be in the storm. When I stopped, I stopped two days just below Mr. Fletcher's farm on the west side of the river, which I judge to be about eight miles probably from this land. * * * In October, 1904, I tied up on the bank on this Duncan league; that is right. As to whether I just simply threw a cable and wrapped it around a tree and anchored my boat, well, I tied it there to the bank. I continued to live in the boat. I am still living in the boat. I am pursuing the occupation of a fisherman, and that is supposed to be my business. That is what I have been doing since I have been there, fishing, not much hunting, but fishing. I fish in the river. * * * It is the river on the Duncan league. I stand on the Duncan league and fish in the river. I am on the Duncan tract and fish in the Neches river. I fish for a living, and when I get fish I sell them and buy such supplies as I need. Now, as to whether 'I continued to hang to that tree on the Duncan league in that house boat until 1905 when I pulled it out on the bank,' well, I pulled it out in 1905. Yes, sir, in the fall of the year of 1905. There was not some high water there at that time, but it was very low water, unusually low stage of water at that time. I did not just get hold of the rope and take a strain on it and yank her right out. The way I got her out, was, I hired two men to help me pull her out. We used a windlass, blocks, and fall, and pulled her out. I pulled her out on the Duncan league. Up to that time I had said something to Mr. Carlton. When I got there in October, why, I had been there but a short time, probably the latter part of October or along in November some time, Mr. Carlton came up there on a fishing trip. That is not when I got acquainted with him, but I knew him in Beaumont before, and I made the suggestion to him that I would like to live there and like to get a lease.

"You ask me the question, 'for the purpose of fishing, I wanted to live there so I could fish,' and I say that I did not state that to him. As to whether that was my purpose and only purpose, well, I wanted to make me a home; that is what I wanted. As to whether I wanted a place to pull my boat out on the land and live in while I fished, well, not while I fished, I expected to stay there all the time, I expected to make my home there. My business was fishing. Now as to whether that is what I wanted a home for to shelter me while a fished, that is, during the time I was pursuing the occupation, why I do not know as I wanted it for that especial purpose. I wanted a home to live there, whether I fished or not. I was cultivating some land. As to whether it was other than a few rows of vegetables that I had planted, well, I had some planted. That is all the farming I did, was to raise some vegetables to eat. It was just a garden to raise my vegetables to eat while I was there. You ask me what time was it in 1905 that Mr. Carlton was up there with me and I broached this subject to him, and I say it was in 1904 when I spoke to Mr. Carlton. Before I had my boat out of the river, I had already made arrangements with Mr. Carlton. When I made the arrangements I did not think it would be in shape to do so until I seen somebody. The next fall I did pull it out. I will now describe that boat to you. It was 12 feet wide and 32 feet long and an 8-foot high house on it from the floor. With reference to how big the house was on the boat, well, it was just one room 22 feet long, a 5-foot gallery on each end. The room is 22 feet long. That is, I just left each end of the boat for a gallery, put a 22-foot room on it, I boxed that width up for the walls of my cabin 12 feet wide and 8 feet high. I pulled that out there in the fall of 1905 and got some men to help me jack it up and put blocks under it, and it has been there ever since. As to whether I said in 1906 I built a little shed on there or kitchen or something, well, I am not very clear whether it was 1907 or 1906 or 1905, but one or the other of the years. I am not positive about that. There is some more improvements out there. I had my garden there. Now, as to how big a garden I had there when I pulled that boat out on the bank, well, I should judge it to be not quite half an acre, somewhere near that. I never measured it, but I judge it would be about half an acre. * * * I fenced it with pickets, made the pickets myself. I have planted a little truck there every year since then. With reference to how big my garden is this year, well, I made an addition to that; that was my first garden we are speaking of now. I made another garden right at the house. It is just about twice as large as the other one I first put there. The other garden is there yet, I suppose. I cultivate it also now. I have got two gardens.

"Now with reference to the length of time I have had two gardens there, the first one I started in 1904, cleared off the land during the fall before I got my boat out, and this lower garden, by the house down here, I put in the same year, when I pulled the boat out. That is, I cleared up all that some time the fall of 1905. I judge it to be about twice as much as the other garden up there. There might be as much as an acre, and it might not be that much. * * * As to whether outside of my garden and my boathouse there was any other improvements until a couple of years ago I built my hog pasture, well, I have got my chicken house and my garden, and I got a toolhouse there. There is the chicken house and a garden and my hog pasture, and I also got another little house pulled out upon the land where I first came out. It is a fact that when I first went up there I took my boathouse up Village creek some distance from the mouth of Village creek. As to whether that is where I anchored it, well, I should judge it is probably about 300 feet from the mouth of Village creek up the creek. Now, with reference to whether the creek is a large stream there at that point, well, I guess it is very near 100 feet wide. Some years it is 2 or 3 feet wide. This year we have not got as much water. I did not pull my boat out some 300 feet up Village creek from the mouth of Village creek, but I afterwards came back down the creek and pulled the boat out of the river. As to whether how far below the mouth of the creek, well, right at the mouth, right where the mouth comes into the river. That was not because there is generally a pretty good fishing at the mouth, and that is not the reason I did that. Fishing is not so good there as it is further up the creek. I did not cultivate any land except to raise a few vegetables for my own use, that's all. As to whether I did not cut any timber or put the land to any other use except to live there and fish in the river, well, all the timber I ever cut there was to use on the place to fence it up and build my little improvements. As to whether I did not use the land for any other purpose than to stay there and fish, well, I do not know whether it was just simply to fish there; I intended to live there and make my

home there. I did not use the land for any other purpose.

"As to whether it is a fact that until 1910 when I signed this paper that I never had any dealings of any kind or character whatever with anybody concerning that land except my conversation with Mr. L. A. Carlton, why during that time I generally made a trip to town once or twice a month, sometimes once or twice a week, and I generally made it a point to go to the office and see Mr. Carlton about it, see if he got things straightened up for me. It is not a fact that he is the only man that I had any dealings with about the staying on that land until I signed this paper in 1910. Mr. Sonfield came up there before the lease was ever made out and looked over the land and seen what I had there and told me to get a lease. That was before I signed this lease, I am sure of that. I would not know how long before it was, I could not state what year that was now, but that was before the lease was signed. The lease is signed in 1910, and this is 1916. * * * I have no recollection as to how long it was before the year 1910 when I signed this lease when Mr. Sonfield came up there; it was some time during the year before the lease was signed. * * * This lease was procured by Mr. Carlton ultimately for me to sign. Now as to whether up to that time and aside from Mr. Sonfield coming up there about that time it is true I never had any dealings with the Creighton-McShane Oil Company or John A. McShane or anybody purporting to represent him, well personally I do not know Mr. McShane. I had not met the man but the conversation I had with Mr. Carlton was about a month after I first landed there. * * * As to whether I said awhile ago as you understand it that until I got this lease I kept after Mr. Carlton about it about getting me the lease on the land, as to whether that is correct, and if I testified to that, well, Mr. Carlton promised me he would get the lease for me, so every time when I went to town I would make it a point to go up to the office to see if Mr. Carlton had got the lease. Finally, he got the lease, which I signed, I suppose so. I myself had nothing to do with the agents or representatives of the Creighton-McShane Oil Company, but only with Mr. Carlton up to the time I went on this land.

"Before the lease was got out, Mr. Carlton brought Mr. Sonfield up there and introduced him to me, and Mr. Sonfield looked over the land, I do not know, but probably about two months after that the lease was signed. Mr. Sonfield did not tell me that they were trying to get a limitation title on this land, and wanted me to stay there and help them get it. There was no limitation mentioned to me, but I was supposed to look after the timber and see that no squatters was on it, but they mentioned no limitation business to me. They did not mention that they were trying to get somebody's title by limitation through me as a tenant, and that was not my understanding about it. All I was to do was to see that nobody cut that timber and that nobody squatter on the land. * * * As to whether I mean to state 'squatted on the land,' well the way I understood it was if anybody came there and built a house or something I was to go and tell them that they were on the land and I was looking after it. * * * I was to look after the whole tract. I do not think there was any limitation on it or any amount of land, or anything like that. I did not get a deed to some of that land there from them, nor did I get a document from them specifying certain portions of that land where I live. I did not get a lifetime lease from the McShane people. I got that lease, but not from the McShane people. I made a new lease with Mr. Keith two years ago, probably three years ago; 1914, I think. I made a lease with Mr. Frank Keith.

"You ask me if I did not tell those gentlemen who visited me out there with the kodak that in Mr. Townes & Carlton's office in Beaumont was a paper belonging to me giving me a lifetime lease on certain portions of that land, and I say not certain portions, I got a lifetime, that wasn't no lease, there is no lease about it, it is simply a lifetime permission while I live to live over there given me by Mr. Frank Keith, not by the McShane people. It does not mention the number of acres at all. You ask me 'if I had any arrangements with anybody to stay there between the time that the Creighton-McShane Company sold to Mr. Frank Keith and the date Mr. Frank Keith or the Keith Lumber Company made this lease to me on the 20th day of February, 1912,' and I say, why, I do not really know that the land was sold to Frank Keith until Mr. Keith brought this lease up to me to sign, then he told me he had bought it from Mr. McShane. He wanted me to sign this lease, which I did. As to whether I said I had a lifetime lease with Mr. Keith, but I had no other lease than this, well, I did not say that I had a lifetime lease. I beg your pardon, I said I had a letter from Mr. Keith giving me permission to stay there as long as I lived; that it was up in the office and not a lease. * * * During this time from 1904 when I moved my boat onto the land up to the time I got this written lease, got a written lease, my understanding was that I was holding that property as the tenant of the Creighton-McShane Oil Company; that was my understanding with Mr. Carlton. Now, as to what I was doing, if anything, towards carrying out my part and my understanding of the lease, well, Mr. Carlton told me to watch over the land and to look out for anybody cutting timber on the land and see that no timber was being cut on it. I did that. Now, as to who got the lease for me, well, I think Mr. Carlton fetched it up one trip coming up there."

We have set out the greater part of the testimony of this witness, and to our minds, as before said, the testimony does not go to that extent in which the court was warranted in saying that as matter of law the limitation claim had been made out and perfected. We have gone into this matter of limitation quite extensively, for the reason that, perhaps, the other objections raised in appellants' brief may not occur in another trial of the case, and, taking that view, we shall not discuss either of the assignments, save and except the assignment which relates to this question and leads us to believe that the error of the court in withholding the testimony from the jury with reference to limitation is such that it is necessary to reverse and remand the cause for a new trial.

Believing, as we do, that the court erred in holding as a matter of law that the possession of Ben Clark constituted a title by limitation to all of the land in controversy, except the west 1,000 acres of defendant, we hold that for this reason this cause must be reversed, and the case remanded for a new trial.